# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
August 14, 2012 Session

## STATE OF TENNESSEE v. STEVEN SHANE NEBLETT

**Direct Appeal from the Circuit Court for Dickson County**
**No. 22CC-2010-CR-713      Robert E. Burch, Judge**

_____

**No. M2011-02360-CCA-R3-CD - Filed October 9, 2012**

_____

A Dickson County jury convicted the Defendant, Steven Shane Neblett, of aggravated assault, and the trial court sentenced him to three years, to be suspended after the service of one year of incarceration. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction, in part, because the State failed to prove that he did not act in self-defense; (2) the trial court offered the jury vague and inappropriate jury instructions; and (3) the trial court erred when it sentenced him by not applying applicable mitigating factors and by imposing an excessive sentence. After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Olin J. Baker, Charlotte, Tennessee, for the appellant, Steven Shane Neblett.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General, and Billy Henry Miller, Jr., Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from a physical altercation between the Defendant and another man, Mark Andrew Akin, the victim in this case. For his participation in the fight, the Defendant was indicted for aggravated assault. The parties presented the following evidence at the trial: Mark Andrew Akin testified he had been friends with the Defendant for over a year. On September 3, 2010, Akin attended a party at the Defendant's home to celebrate another friend's, Mitchell Taylor, enrollment in the Army. Akin arrived at the party between 8:00 and 8:30 p.m., and he began consuming alcohol. Akin recalled that he consumed approximately four or five "Dixie" cups of beer and also a shot of Jack Daniels during the two and a half hours that he was at the party.

Akin described the time he spent at the party, saying that when he arrived he was talking to other people there and having a good time. About an hour or an hour and a half later, he went from the front of the trailer to walk around the back. When Akin arrived in the back, Jason Wall "came up to the side of my face hollering and screaming at my ear." Akin explained that he had a hearing impairment, which was a result of his suffering spinal meningitis as a child, and he wore a hearing aid. He said that Wall screaming in his ear "hurt" him. Akin testified that he pushed Wall away from him, shortly after which the Defendant came from behind Akin and "sucker punched" him. Akin said that this caused him to fall face first onto the ground. The Defendant then rolled Akin over, got on top of him, and hit him multiple times with his elbows. Akin said that the blows were "with so much force that it knocked the hearing aid" out of his ear. Akin said that the Defendant broke his cheek bone and his nose. Akin testified that the blows also rendered him unconscious.

Akin testified that, after he regained consciousness the following morning, he noticed that he was bleeding "profusely." Akin said that, when he looked in the mirror, he noticed that part of the left side of his nose bone was in his eyeball socket. He described the pain from his broken bones as "excruciating." Akin testified that, before Wall screamed in his ear, he and Wall had not had any problems.

Akin said that he went to the doctor approximately one week after this altercation, in part, because he could not hear properly with his hearing aid. The doctor informed him he needed surgery to fix his eye socket and, at the time of trial, he still needed another surgery. Akin said he was being treated for Post Traumatic Stress Disorder related to this incident and that he suffered memory problems.

Akin further testified that the Defendant's father attempted to get Akin to "drop" the lawsuit. He explained that, on Valentine's day, the Defendant's father came to his house and told him a version of events that had occurred. Akin did not agree with that rendition of the events and asked the Defendant's father to leave.

During cross-examination, Akin conceded that he was hit from behind, so he was unsure who struck him. He said, however, he had been told that it was the Defendant. Akin agreed that he was "impaired" at the time of the altercation from the alcohol that he had consumed. He agreed that he did not seek medical treatment for eleven days after the incident. After seeking medical treatment, he was referred to Vanderbilt, and his appointment was scheduled for several days later. He said that his injuries "should have," but did not, require "urgent immediate treatment." Akin said he filed a police report on October 20, 2010.

Akin testified that the Defendant drove him home after this incident. Akin said that his father was there when he arrived home, and that the Defendant spoke to Akin's father when he dropped him off.

Dr. Steven Press, an assistant professor in oral, maxillofacial surgery at Vanderbilt University, testified that he performed surgery on Akin. He said that this surgery was conducted September 21, 2010, and he described the surgery as a "closure reduction of nasal fracture and open reduction of internal fixation of the left orbital rim fracture." He explained that this meant that Akin had fractures of the nasal bone and the bottom part of his eye socket and that, during the surgery, the fractures were reduced and repaired.

Dr. Press described Akin's orbital bone fracture as "compound," which required him to implant titanium plates and titanium screws. Dr. Press described the recovery process from that surgery as taking six weeks for the average person and as being painful. The doctor opined that Akin's fractures were consistent with being struck in the face with an elbow or being kicked in the face with the toe or heel of a boot.

During cross-examination, the doctor testified that he considered this surgery a "serious" surgery but conceded that it was not a life-threatening surgery. He agreed that it was "possible" that Akin's injuries could have been caused by him flipping over someone's back and landing on his face.

Shawna Marie Sweeney testified that, at the time of trial, she was nineteen years old. She said she was present at the party where this altercation occurred, having been invited there by her fiancé, Blake Dunn. At the time, she had met the Defendant but the two were not close friends. Sweeney testified that she and Dunn arrived at the party together between 8:00 p.m. and 10:00 p.m. When she got out of the car, the Defendant's girlfriend, "Brandy," Jason Wall's sister, "Gaina," and two other women, "Dana" and "Summer," "came after her" and "jump[ed] her." Sweeney said that Brandy was mad that Sweeney had come to the party because she believed that Sweeney liked the Defendant. Sweeney opined that "it escalated" because the four women had been drinking.

-3-

Sweeney testified that the women punched her and hit her and that she fell down. She said that she suffered from scoliosis and had a rod and screws in her back, so she fought back to prevent further injury to her back. During this incident, Sweeney noticed that Akin was talking to the Defendant and Wall.

Sweeney said that, after the fight between her and the other women ceased, Brandy went back to the front porch and took her two toddlers inside the trailer. Sweeney then saw the Defendant hit Akin, who had just been standing there talking to someone else, in the back of the head. Akin hit the ground and seemed to be unconscious. "[A]ll of a sudden," the Defendant got on top of Akin and elbowed and punched him in the face two or three times. Sweeney said, "It looked awful." Wall then approached and kicked Akin in the head. Sweeney said Akin never resisted because he was unconscious. Sweeney recalled that Akin was "bloody" and that "it looked bad." She recalled that Akin did not wake for approximately an hour.

Sweeney said that, while the Defendant was punching Akin, another man, named Jarred Chester, walked around the trailer. Chester grabbed Akin, and pulled him up onto the porch and tried to clean some of the blood from him. Sweeney said that a man named Chris Herrell arrived after the fight had concluded and that she did not recall seeing a man named Josh Clark at the party.

During cross-examination, Sweeney testified that she stayed at the party after the women had attacked her because they went inside the trailer while she remained outside. She said Wall kicked Akin two or three times after the Defendant had stopped elbowing him. She said, during the altercation, she yelled at the men and told them to "stop."

Jarred Chester testified about this incident, saying that he had been invited to the Defendant's house by his friend Mitchell Taylor, the man for whom the party was being thrown. The party was in celebration of Taylor being inducted into the U.S. Army. Chester said that he had known the Defendant most of his life and that the two were "pretty good friends." Chester was also friends with Akin. Chester estimated that he consumed six or seven beers while he was at the party.

Chester said that, before the incident in question, he and Akin exchanged "words." He said that Akin was "kind of picking with [him]," and Chester took Akin's "messing around" the wrong way. Chester said, however, that the exchange never became physical and that the two men apologized to each other.

Chester testified that he witnessed the altercation between the Defendant and Akin. He said he was on the other side of the trailer at the time, and, when he walked around the

house, the Defendant was on top of Akin. The Defendant "thr[e]w two elbows to [Akin's] face." Chester said he "ran up there and told [the Defendant] that he was done and [the Defendant] got off of [Akin]." Chester said he carried Akin, who did not appear "all the way conscious," up to the porch. There, Chester attempted to clean Akin up because Akin was very bloody.

During cross-examination, Chester testified that he did not see the beginning of the fight. He further testified that he did not see Wall during the altercation. Chester said that, when he and Akin exchanged words, they were "close to coming to blows" and that the Defendant stepped in and split the two men apart. Chester said that Akin was intoxicated during the party.

During redirect examination, Chester testified that neither Chris Herrell nor Joshua Clark were present when the Defendant was elbowing Akin.

Gerald Lee Akin, Akin's father ("Mr. Akin"), testified that his son lived with him at the time of this incident. Mr. Akin said that his son had been at a party at the Defendant's house on September 3. Between 9:45 p.m. and 10:15 p.m. that evening, the Defendant arrived at Akin's house driving Akin's truck. The Defendant approached Mr. Akin, who was standing with his other son, and apologized about "what he had done and everything." The Defendant said, "I'm sorry" and "I didn't know it was him and I just started pounding him and stuff." The Defendant never mentioned anything about self-defense and, instead, said he thought Akin was someone else when he attacked him.

Mr. Akin said he did not see Akin until after the Defendant had left. Mr. Akin said that his son's eye was swollen and bleeding. His nose was also swollen, and he had marks on his neck, arms, and back. Akin also had a knot on his head. Mr. Akin said his son was "in and out of it just like in a daze."

Mr. Akin testified that he called the police and a deputy arrived at his house with an ambulance. The ambulance checked Akin and said it looked like he "just got beat up" and that it was mostly swelling. Mr. Akin said it took a week for the swelling to subside and, when it did, Akin had a bone protruding from his cheek. At that point, he took Akin to the doctor.

During cross-examination, Mr. Akin testified that the Defendant and his son were friends at the time of this incident.

The Defendant presented several witnesses. Casey Lee Harrison, Akin's cousin, testified that Akin came to his house on the day after this altercation. Akin had "a black

eye," and Harrison asked him what had happened. Harrison said Akin told him that "he was over at [the Defendant's] house [and] there was a fight going on and he jumped on [the Defendant's] back and [the Defendant] flipped him off, punched him in the face before he knew who [Akin] was." Harrison said that Akin asked him to go with him to the Defendant's house and "whip him," and Harrison told Akin that Harrison did not want to get involved. During cross-examination, Harrison testified that Akin's face was not swollen or bleeding.

Brandy Jo Hasley, the Defendant's girlfriend, testified that, on September 3, they were having a party at the Defendant's house. Sweeney, she said, was told not to be there because Sweeney had been stealing from Hasley. Sweeney came to the party despite not being invited and approached her "screaming and yelling." Hasley said she "wound up going off her front porch," leaving her son on the porch, and punched Sweeney in the face. Hasley said she and Sweeney began fighting "up and down the driveway." At the end of the fight, Sweeney got into her car and left.

Hasley said that the Defendant and Akin got into a physical altercation after Sweeney had backed out of the driveway. Hasley said she did not see the beginning of the altercation because she was fighting Sweeney. She said, when she turned around after watching Sweeney leave, she saw the Defendant hit Akin one time and stand up off of him. Chester and Taylor assisted Akin to the front porch. Hasley said she went to get something to wipe off Akin's face. Hasley asked the Defendant why he had hit Akin because the Defendant and Akin were best friends. The Defendant said he did not know.

Hasley said she saw Akin consume six beers and Jack Daniels from a bottle before the altercation.

During cross-examination, Hasley testified that she was the Defendant's child's mother and that she and the Defendant lived together with her two children, a three-year-old and a four-year-old. She said that she did not call the police when Sweeney stole from her because the items that Sweeney took were of little value. She was still, however, upset by Sweeney's actions. Hasley agreed that she did not see very much of the fight and that she only saw the Defendant hit Akin one time.

Summer Gail Neblett, the Defendant's sister, testified that she attended the party at the Defendant's trailer and saw Sweeney and Dunn drive up to the house. As soon as Sweeney arrived, Hasley and Sweeney engaged in a physical altercation because Sweeney was not supposed to come to the party. People gathered around the two women, who were fighting. Akin was standing behind the Defendant, and they were both watching the fight. The Defendant, she said, "g[ot] grabbed," so he turned and started hitting the person who grabbed him. Neblett said the Defendant only hit the person two or three times before he got

-6-

off of him and discovered it was Akin.

Neblett said that Akin regained consciousness and got into his truck and said he was going home. He, however, began driving in the direction opposite of his house. Neblett said she and the Defendant got into their car to follow Akin and make sure he got home safely. Akin drove into an embankment, and the Defendant got into Akin's truck and began to drive. Neblett said she followed the Defendant, who was driving Akin in Akin's truck, back to Akin's house. She said the Defendant told Akin's father that he was sorry and that Akin had grabbed him, so the Defendant punched Akin.

During cross-examination, Neblett testified that, at the time, she was preoccupied, watching the fight between Hasley and Sweeney, when the fight between the Defendant and Akin began.

Christopher Todd Herrell testified that he was at the party where Akin and the Defendant engaged in a physical confrontation. He said that, earlier in the evening, he saw Dunn and Sweeney at a BP station. The two told him that they were tired of hearing people talk about them and that they were going to the Defendant's house so Sweeney could fight Hasley. Herrell said he thought "all right, cool, I'll be going up there and watch a girl fight," in part because he "hadn't seen a girl fight in awhile." When he arrived at the party, Sweeney and Hasley were fighting. The girls did not have much light, so Herrell left the lights of his truck on when he exited the truck, in order to better illuminate the fight.

Herrell said he joined in the crowd of people gathered around the fight. Herrell said that, about fifteen to twenty feet away from the fight, Dunn pushed Wall. The next thing Herrell knew, Akin grabbed the Defendant from behind. The Defendant flipped Akin over, and the two started to fight. Herrell said that he did not watch the fight between the Defendant and Akin because he was more interested in watching the fight between the two women. He did, however, hear people yelling at the Defendant to get off of Akin. He then saw his stepson, Mitchell Taylor, and Chester carry Akin over to the porch. Herrell said Akin's actions "shocked" him because it was out of character for Akin. Herrell said that the Defendant did not realize who grabbed him before he flipped him over. Herrell recalled that the Defendant only hit Akin "a few times."

During cross-examination, Herrell said he did not know why Chester would have testified that he was not at the party. He said that he was not drinking the day of the party and clearly remembered the events that occurred. Herrell said that the Defendant was "defending himself" when he hit Akin. He conceded that Akin was on the ground when the Defendant started hitting him.

Jason Douglas Wall testified that he was a co-defendant in this case. He described the events leading to the fight, saying that he was at the party when Dunn and Sweeney arrived. Hasley and Sweeney began fighting. Wall said he went outside and he and Dunn began arguing because Wall told Dunn he should not have brought Sweeney to the party. Wall said, "all of a sudden," Akin came between Dunn and Wall and grabbed the Defendant from behind. The Defendant flipped Akin over his back and then punched him. Wall said that the Defendant did not know who he was punching even after he got up. Wall said that they were all friends and had been together all night. Wall testified that, while he was charged with doing so, he never stomped or kicked Akin.

Wall recounted that Akin and Chester got into a verbal altercation earlier in the evening. He said that Chester spilled beer on Akin's shoe, and Akin was "bound and determined he was going to whip his butt over that." He thought the men were going to have to make Chester leave, but Akin eventually calmed down.

During cross-examination, Wall agreed that he saw the Defendant strike Akin once or twice when Akin was on the ground. He said he then turned away to continue watching the women fighting, so he did not see how the fight between the Defendant and Akin ended. Wall said that, after the fight concluded, Taylor and Chester assisted Akin to the porch. Wall went to look at Akin, who was still unconscious, and he saw a cut under his eye.

Joshua Cory Clark testified that he had known Akin for a long time. He said that he had his "first altercation[]" with Akin a year and a month before the trial. He described the altercation, saying that he was having a housewarming party with a mutual friend and that Akin came to the party. He said that, at first, Akin was "nice and playful" and then, as he got a little more inebriated, Akin wanted to "wrestle around." Clark said that he and Akin had a physical altercation that evening. He said that, a month before the trial, he and Akin got into another physical altercation when Akin struck him.

Based upon this evidence, a Dickson County jury convicted the Defendant of aggravated assault.

## B. Sentencing

The trial court held a sentencing hearing, during which the parties stipulated to the presentence report and also that Akin's medical expenses totaled $16,511.58. The parties then presented the following evidence: Akin testified that, as a result of his injuries, he had difficulty thinking. He said that it took his injuries several months to heal, resulting in him being fired from his job. He had not yet, at the time of sentencing, been able to find other employment.

-8-

Akin testified that the amount of medical bills stipulated to did not include the $2,500 he was going to have to pay to replace his hearing aid that was damaged in the altercation. He said that his doctors had also advised him that he was going to need another surgery. He said that he had not scheduled the surgery because he did not have medical insurance.

Akin agreed that, the weekend before the sentencing hearing, he had been charged with DUI and simple possession. He said that, at the time, he was on probation for a separate simple possession conviction. Akin asked the trial court to sentence the Defendant to two or three years with no probation.

During cross-examination, Akin agreed that he had also been charged with violating his probation. Akin testified that he and the Defendant were friends before this incident and that the Defendant drove him home that evening. Akin said that he suffered from bipolar disorder as a result of this incident. He agreed, however, that the treatment he was seeking was for more than the mental injuries from this assault.

Akin agreed he asked the Defendant to pay his medical bills before he filed these charges and, after the Defendant denied his request, he filed charges against the Defendant. He said the case was more about medical bills than anything else.

The Defendant testified about the events leading to this fight, saying that Sweeney's boyfriend had grabbed the Defendant's fiancé. He said that he went to assist his fiancé when Akin grabbed him in a choke hold from behind, trying to pull him down. He said Akin choked him "pretty hard" and he "about lost consciousness." He said his only option was to "push up" and when he "pushed up his face just planted the ground." The Defendant said he had no intention of hurting Akin, as the two had been friends for two to four years without any problems between them. The Defendant said he was "sorry it ever happened" and that "[i]f [he] had known it was [Akin] [he] never would've even done anything."

The Defendant said that, when he took Akin home, Akin's father told him to leave and not to come back. He said that was why he had not gone back to Akin's house to apologize.

The Defendant said that his trailer had recently burned and he lost most of what he owned. He said that he had purchased another trailer that he was trying to get "setup" for his fiancé and their two children. He said that he was the sole provider for his family, and, with his attorney's fees, he was unable to manage all of his expenses. His father was helping him financially, and he worked for his father at a carpet installation store. The Defendant implored the trial court to sentence him to probation. The Defendant assured the trial court that he would abide by the terms of his probation and report to his probation officer as required.

The Defendant explained that, the night of the fight, after Chester and Taylor took Akin to the porch to clean him up, he heard a humming noise in the driveway. He followed the sound and found Akin's hearing aid. He went to the porch and handed the hearing aid to Akin.

The Defendant said that, when he drove Akin home that night, he apologized to Mr. Akin. He said he "was almost in tears [be]cause I was that sorry for hurting a friend of mine [be]cause I know he had been drinking that night; and you know, I felt bad." He said he told Mr. Akin that he never intended for any of this to happen.

The Defendant said he had no prior felony convictions but that he had previously been convicted of two DUIs and also possession. He clarified that he had not been in trouble for five years before this incident. The Defendant offered an apology to Akin and Mr. Akin.

During cross-examination, the Defendant said that he had been convicted of "simple possession" on three prior occasions. The Defendant agreed that he hit Akin in his face once with his fist and twice with his elbow.

Gerald Akin, Andrew Akin's father, testified that his son did not come home with his hearing aid on the night of the fight. Mr. Akin said his other son went to the Defendant's house to look for the hearing aid. Mr. Akin did not know whether his son found it or the Defendant found it and gave it to his son.

Mr. Akin testified that, the night of the fight, the Defendant "c[a]me across the yard apologizing." When Mr. Akin saw his son, his son was in the bathroom "all bloody and disoriented." Mr. Akin said he went back out in his yard and told the Defendant to leave.

Based upon this evidence, the trial court found that the Defendant had been convicted of a Class C felony, as a Range I offender, with a sentencing range of not less than three or more than six years. The trial court applied one enhancement factor, that the Defendant had a previous history of criminal convictions, having previously been convicted of five misdemeanors. *See* T.C.A. § 40-35-114 (1) (2010). The trial court applied two mitigating factors, first that the Defendant assisted Akin after the fight by driving him home and also that he was remorseful. *See* T.C.A. § 40-35-113(13) (2010).

The trial court denied full probation to the Defendant, finding that measures less than confinement had frequently been applied unsuccessfully to the Defendant and noting that the Defendant had been on probation five different times and still continued to violate the law. The trial court found the facts of this case "egregious" in that Akin was lying helpless on the ground while the Defendant "pummeled" him.

The trial court sentenced the Defendant to three years and ordered him to serve one year of incarceration and the remainder of his sentence on probation. The Defendant appeals his judgment of conviction and also his sentence.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction, in part because the State failed to prove that he did not act in self defense; (2) the trial court offered the jury vague and inappropriate jury instructions; and (3) the trial court erred when it sentenced him by not applying applicable mitigating factors and by imposing an excessive sentence.

### A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for aggravated assault. He asserts that the evidence does not support the jury's verdict and also that the evidence proved that "all acts" he committed were "solely done in self-defense." He further contends that it is the State's burden to prove that he did not act in self-defense and that the State failed in meeting this burden. The State counters that it presented sufficient evidence to support the Defendant's conviction and to refute the Defendant's claim of self-defense. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Proof of Aggravated Assault

In this case, the Defendant was convicted of aggravated assault. According to our statutes, "(a)(1) A person commits aggravated assault who: (A) Intentionally or knowingly commits an assault as defined in § 39-13-101 and: (I) Causes serious bodily injury to another . . . ." T.C.A. § 39-13-102(a)(1)(A) (2010). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2). "Serious bodily injury" means bodily injury that involves: "(A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; (E)

-12-

[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) [a] broken bone of a child who is eight (8) years of age or less." T.C.A. § 39-11-106(a)(34)(A)-(F) (2010).

According to Tennessee Code Annotated section 39-13-101, a person commits assault who:

> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

T.C.A. § 39-13-101(a)(1)-(3) (2010).

The evidence in this case proves that the Defendant intentionally or knowingly caused bodily injury to Akin, punching him once and elbowing him twice in the face. We turn to address whether Akin suffered "serious bodily injury."

The Tennessee Supreme Court recently discussed the statutory definition of "serious bodily injury" when it addressed whether a gunshot wound that passed through the victim's leg constituted "serious bodily injury." The Court ultimately concluded that the gunshot wound did not meet the statutory definition of "serious bodily injury" because the injury, as it occurred, did not involve a substantial risk of death, the victim did not lose consciousness, the victim did not suffer extreme pain, and because nothing in the victim's testimony supported an inference that his injury involved protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. *See State v. Farmer*, – S.W.3d – , 2012 WL 3594242, at *4-5 (Tenn. Aug. 22, 2012).

We conclude that this case is distinguishable from *Farmer*, in that Akin suffered protracted unconsciousness and extreme pain as discussed below, and that the State proved the necessary elements of "serious bodily injury." There was much testimony at trial that the Defendant's actions of punching and elbowing Akin rendered Akin unconscious. Witnesses said Akin was "out" and that the Defendant kept hitting him. Other witnesses said they helped the unconscious Akin to the porch, where they attempted to awaken him. Akin was in and out of consciousness and had no memory after being hit until the following morning. Further, he said he suffered memory problems as a result of the blows. This evidence

-13-

sufficiently supports that Akin suffered "[p]rotracted unconsciousness." Further, Akin described the pain from his broken facial bones as "excruciating." We conclude, therefore, that the evidence sufficiently supports the elements of aggravated assault.

## 2. Proof Refuting Claim of Self-Defense

The Defendant next contends that it was the State's burden to prove that he did not act in self-defense and that the State failed in its burden. The State counters that it presented sufficient evidence refuting the Defendant's claim of self-defense. We agree with the State.

Tennessee Code Annotated section 39-11-611(b)(1) and (b)(2) provide that:

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have "a reasonable belief that there is an imminent danger of death or serious bodily injury[.] The danger creating the belief of imminent death or serious bodily injury [must be] real, or honestly believed to be real at the time, and must be "founded upon reasonable grounds." There is no duty to retreat before a person threatens or uses force.

Self-defense is a fact question for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001).

Viewed in the light most favorable to the State, the evidence proves that the Defendant ran up and punched Akin in the back of the head. Akin then fell onto his back, and the Defendant hit him in his face with his fists and his elbow. The Defendant presented testimony that Akin first approached the Defendant from behind and choked him and that, in response, the Defendant flipped Akin over onto his back. By all accounts, however, the Defendant elbowed and punched Akin multiple times while Akin was lying on the ground. The jury was within its province to reject the claim that Akin first attacked the Defendant from behind, as there were multiple State witnesses who said that the Defendant ran up and punched Akin in the back of the head first. Further, even if the jury accepted that Akin first grabbed the Defendant from behind, it was within its province to determine that the

-14-

Defendant did not reasonably believe that there was "an imminent danger of death or serious bodily injury." *See* T.C.A. §39-11-611(b)(2) (2010). We will not second-guess the factual determinations made by the jury. Therefore, we conclude that the evidence was sufficient to convict the Defendant of aggravated assault.

## B. Jury Instructions

The Defendant next contends that the trial court offered the jury vague and inappropriate jury instructions. The Defendant contends that the trial court improperly instructed the jury on the lesser-included offense of reckless endangerment. He states that, because he was acting in self-defense, he did not possess the requisite mens rea to sustain reckless endangerment. The State counters, first, that the Defendant has waived this issue. Alternatively, it asserts that the trial court properly instructed the jury.

The State correctly notes that the Defendant has failed to provide citations to the record in this section of his brief. Our rules require that each issue raised by a defendant contain "citations to the authorities and appropriate references to the record." Tenn. R. App. P. 27(a)(7)(A). While the Defendant risked waiver, the jury instructions are contained in the technical record for our review. We, therefore, choose to address this issue on its merits.

The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001) (citing *State v. Smiley*, 38 S.W.3d 521 (Tenn. 2001)). The standard of review for mixed questions of law and fact is de novo with no presumption of correctness. *Id*.; *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). A trial court has a "duty to provide a 'complete charge of the law applicable to the facts of the case.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). In determining whether jury instructions are erroneous, this Court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

"In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002). In *State v. Burns*, 6 S.W.3d 453 (Tenn.1999), our Supreme Court adopted the following two-step process for determining if the evidence justifies a jury instruction on the lesser-included offense:

First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

*Id*. at 469.

In *State v. Hatfield*, 130 S.W.3d 40, 43 (Tenn. 2004), our Supreme Court held that felony reckless endangerment is a lesser-included offense of aggravated assault where the aggravated assault is charged as having been committed by causing actual bodily injury.

We conclude first that felony reckless endangerment was an appropriate lesser-included offense in this case. The Defendant contends specifically, however, that because the evidence proved that "he was acting in self-defense at the time of the altercation with [Akin]" this was not an appropriate jury instruction. As stated above, it was within the jury's province to determine whether the Defendant was acting in self-defense. The trial court provided the jury with an instruction on self-defense. The trial court also provided the jury with an instruction on felony reckless endangerment and, given the proof, we conclude that the felony reckless endangerment instruction was proper. The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant contends that the trial court erred when it sentenced him by failing to apply applicable mitigating factors and by imposing an excessive sentence. The Defendant asserts that the trial court failed to appropriately consider as a mitigating factor that he presented "conclusive proof" that his actions were done "solely in furtherance of self-defense." *See* T.C.A. § 40-35-113(2) (2010). He further asserts that the "ends of justice" would be better served if he were given a fully probated sentence. The State counters that the trial court properly rejected self-defense as a mitigating factor because the jury rejected the Defendant's self-defense claim. The State further asserts that the trial court properly sentenced the Defendant to a sentence involving incarceration.

### 1. Mitigating Factors

On appeal, the Defendant argues that his sentence is excessive. He asserts that the trial court did not properly apply the applicable mitigating factors. Specifically, the

Defendant contends that the trial court failed to consider his actions as self-defense. The State argues that the trial court properly rejected self-defense as a mitigating factor.

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e)(2010). Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9.

Our review of a defendant's challenge to the length, range, or manner of service of a sentence, has been a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). In a recent opinion, our Supreme Court provided a thorough review of the more recent developments in our sentencing laws and adopted a new standard of review for sentencing in light of these changes. *State v. Bise*, - - - S.W.3d - - -, 2012 WL 4380564 (Tenn. Sept. 26, 2012). In announcing the new standard of review the *Bise* court reasoned:

> [W]hen the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the "presumption of correctness" ceased to be relevant. Instead, sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a "presumption of reasonableness."

*Bise*, 2012 WL 4380564, at *19. Therefore, we now review the Defendant's issue challenging the trial court's application of mitigating factors under an abuse of discretion standard with a "presumption of reasonableness." *Id.*

The Defendant fails in his brief to specifically state which mitigating factor or factors the trial court improperly failed to apply, thereby risking waiver of this issue. Tenn. R. Crim. P. 10(b). His argument does address two possible mitigating factors. Tennessee Code Annotated section 40-35-113 states, "If appropriate for the offense, mitigating factors may

include, but are not limited to: . . . (2) The defendant acted under strong provocation; [or] (3) Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." The trial court rejected any notion that the facts supported the existence of strong provocation. When rejecting that substantial grounds existed to excuse the Defendant's behavior, the trial court stated:

> Substantial grounds exist tending to excuse or justify the conduct, although, failing to constitute a defense. I presume that that has to do with the alleged self-defense aspect of this case. Quite frankly, of course, the jury rejected that; but . . . using the [D]efendant's version of the events the so called flipping really wasn't the crime. It was what happened after that; and that the punching in the face with the fist and elbow after [Akin] had been rendered helpless was the crime in this situation; and there's certainly no justification for it and the Court does not find it.

Based on the evidence presented, we agree with the trial court's conclusion that the jury's verdict rejecting the Defendant's claim of self-defense justified the trial court's rejection of mitigating factor (2). *See State v. Fred Edmond Dean*, No. 03C01-9508-CC-00251, 1997 WL 7550, at *11 (Tenn. Crim. App., at Knoxville, Jan. 10, 1997), *perm. app. denied* (Tenn. Sept. 2, 1997). We similarly conclude that the trial court properly rejected mitigating factor (3). The State's version of the events was that the Defendant, without provocation, punched Akin in the back of the head. The Defendant's version was that Akin grabbed him and that he flipped Akin over his back. This, as the trial court noted, was not the crime. The crime occurred when the Defendant repeatedly punched and elbowed Akin into unconsciousness while Akin was lying on the ground. Thus, the trial court properly rejected mitigating factor (3).

Accordingly, the trial court did not abuse its discretion when it declined to apply mitigating factors (2) and (3) to the Defendant's sentence. The Defendant is not entitled to relief as to this issue.

## 2. Denial of Full Probation

The Defendant next contends that the trial court erred when it sentenced him to a sentence involving confinement, rather than full probation. The State counters that the trial court made the proper considerations and properly denied full probation.

To meet the burden of establishing suitability for full probation, a defendant must demonstrate that full probation will subserve the ends of justice and the best interests of both the public and the defendant. *State v. Blackhurst*, 70 S.W.3d 88, 97 (Tenn. Crim. App.,

-18-

2001). The following criteria, while not controlling the discretion of the sentencing court, shall be accorded weight when deciding the defendant's suitability for full probation: (1) the nature and circumstances of the criminal conduct involved; (2) the defendant's potential or lack of potential for rehabilitation; (3) whether a sentence of full probation would unduly depreciate the seriousness of the offense; and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. T.C.A. §§ 40-35-103(1)(B), -103(5), -210(b)(4) (2010); *see also Blackhurst*, 70 S.W.3d at 97.

In the case under submission, the Defendant is eligible for full probation because his sentence is ten years or less (subject to certain statutory exclusions not relevant here). T.C.A. § 40-35-303(a) (2010). Although full probation must be automatically considered by the trial court as a sentencing alternative whenever the defendant is eligible, "the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b) (2010), Sentencing Comm'n Cmts.

When rejecting full probation for the Defendant, the trial court found that measures less restrictive than confinement had frequently been applied unsuccessfully to the Defendant in that he had been on probation five different times and still continued to violate the law. The trial court further found that the facts of the case were "egregious" because Akin was "helpless . . . lying on the ground" and was "pummeled" by the Defendant.

The Defendant either punched Akin in the back of the head unprovoked or flipped him over his back after Akin grabbed him from behind. The Defendant then punched Akin repeatedly in the facing, using both his fists and his elbows. Akin was rendered unconscious for an extended period of time, suffered facial fractures and excessive bleeding, and required multiple surgeries to correct his injuries. The Defendant has been ordered to probation on five different occasions. We agree with the trial court that the facts of this case do not demonstrate that full probation will serve the ends of justice and the best interests of both the public and himself. We conclude, therefore, that the trial court properly denied the Defendant full probation, ordering him to serve one year of the three-year sentence in confinement and the remainder on probation. *See Blackhurst*, 70 S.W.3d at 97. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the evidence supports the Defendant's conviction, that the trial court properly instructed the jury, and that the trial court properly sentenced the Defendant. We, therefore, affirm the Defendant's conviction and sentence.

_____
ROBERT W. WEDEMEYER, JUDGE